1  Ely Grinvald, Esq. (SBN 285475)
2  2355 Westwood Blvd., #562
   Los Angeles, CA 90064
3  Phone: (310) 405-5684
4  grinvaldely@gmail.com

5  *Attorney for Plaintiff,*
6  *Melanie Sartor*

7              **UNITED STATES DISTRICT COURT**
            **NORTHERN DISTRICT OF CALIFORNIA**
8

9   **MELANIE SARTOR,**

10                           **Plaintiff,**
                                                Case No: 3:25-cv-10391
11               **v.**
                                                **COMPLAINT**
12
    **UPGRADE, INC.,**
13
                                                **JURY TRIAL DEMANDED**
14                          **Defendant.**

15

16       Plaintiff Melanie Sartor, by and through the undersigned counsel, complains,

17  states, alleges, and asserts, against defendant Upgrade, Inc., as follows:

18
                                **INTRODUCTION**
19

20       1.    This is an action to recover damages negligence, substantially assisting

21  violations of the FDCPA and FCRA, and for violations of the Fair Credit Reporting

22  Act, ("FCRA"), 15 U.S.C. § 1681, *et seq.*

23
                                    **FDCPA**
24

25       2.    In 1977, Congress enacted the Fair Debt Collection Practices Act

26  ("FDCPA"), codified at 15 USC §§ 1692 *et seq.*, in response to the "abundant

27

28                                      - 1 -                    COMPLAINT AND
                                                               DEMAND FOR JURY TRIAL

evidence of the use of abusive, deceptive, and unfair debt collection practices by many debt collectors." 15 U.S.C. § 1692(a).  At that time, Congress was concerned that "abusive debt collection practices contribute to the number of personal bankruptcies, to marital instability, to the loss of jobs, and to invasions of individual privacy." *Id*.  Congress concluded that "existing laws . . . [we]re inadequate to protect consumers," and that "the effective collection of debts" does not require "misrepresentation or other abusive debt collection practices." 15 U.S.C. §§ 1692(b) and (c).

3.    Congress explained that the purpose of the Act was not only to eliminate abusive debt collection practices, but also to "ensure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged."  *Id*., § 1692(e).  After determining that the existing consumer protection laws were inadequate, Congress gave consumers a private cause of action against debt collectors who failed to comply with the Act.  *Id*., § 1692k.

4.    In determining whether a collection letter violates the FDCPA, courts in the Ninth Circuit apply the least sophisticated consumer standard, "[i]f the least sophisticated debtor would likely be misled by a communication from a debt collector, the debt collector has violated the [FDCPA]." *Guerrero v. RJM Acquisitions LLC*, 499 F.3d 926, 934 (9th Cir. 2007).

COMPLAINT AND
DEMAND FOR JURY TRIAL

5.     The FDCPA does not ordinarily require proof of an intentional violation, and is considered a strict liability statute, whereby a single violation is sufficient to establish civil liability against a debt collector.

### FCRA

6.     The FCRA is a federal statute that broadly regulates the credit reporting agencies and furnishers of credit information. Among other things, the FCRA prohibits credit reporting agencies and furnishers from reporting incomplete or inaccurate information on a consumer's credit report.

7.     Enacted in 1970, the FCRA's passage was driven in part by two related concerns: first, that consumer reports were playing a central role in people's lives at crucial moments, such as when they applied for a job or credit, and when they applied for housing. Second, despite their importance, consumer reports were unregulated and had widespread errors and inaccuracies.

8.     While recognizing that consumer reports play an important role in the economy, Congress wanted consumer reports to be "fair and equitable to the consumer" and to ensure "the confidentiality, accuracy, relevancy, and proper utilization" of consumer reports. 15 U.S.C. § 1681.

9.     Congress, concerned about inaccuracies in consumer reports, specifically required consumer reporting agencies to follow "reasonable procedures to assure maximum possible accuracy" in consumer reports. 15 U.S.C. § 1681e(b).

10.     Consumer reports that contain factually incorrect information which does not belong to the consumer at issue are neither maximally accurate nor fair to the consumers who are the subjects of such reports.

11.     The FCRA is intended to ensure consumer reporting agencies exercise their grave responsibilities with fairness, impartiality, and a respect for the consumer's right to privacy because consumer reporting agencies have assumed such a vital role in assembling and evaluating consumer credit and other consumer information.

## JURISDICTION AND VENUE

12.     This Court has federal subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1337, and 15 U.S.C. § 1681(p).

13.     This court has jurisdiction over defendant Upgrade, Inc. because defendant Upgrade, Inc. regularly conduct and transact business in the State of California, and is located in this Judicial District.

14.     Venue is proper in this Judicial District under 28 U.S.C. § 1391(b) because a substantial part of the conduct complained of herein occurred in this

COMPLAINT AND
DEMAND FOR JURY TRIAL

Judicial District and defendant Upgrade, Inc. is located in this Judicial District.

## PARTIES

15.    Plaintiff Melanie Sartor ("Plaintiff") is a natural person who is a citizen of the State of Ohio residing in Uniontown, Stark County, Ohio.

16.    Plaintiff is a "consumer" as that term defined by 15 U.S.C. § 1692a(3).

17.    Plaintiff is a "consumer" as that term is defined by the FCRA.

18.    Defendant Upgrade, Inc. ("Upgrade") is a company existing under the laws of the State of Delaware, with its principal place of business at 275 Battery Street, Suite 2300, San Francisco, CA 94111, and does business in the State of California and within this District.

19.    Upgrade is a "furnisher of information" as that term is defined by the FCRA, 15 U.S.C. §1681s-2(b).

## FACTUAL ALLEGATIONS

20.    Midland Credit Management, Inc. ("MCM") is a wholly-owned subsidiary of Encore Capital Group, which is one of the largest debt purchasers in the world.  In 2024, MCM purchased record volumes of defaulted consumer debt, totaling $1 billion and collected $1.6 billion from consumers. At the end of 2024, MCM's estimated remaining collections exceeded $5 billion.

21.    According to data provided by the Consumer Financial Protection

Bureau (the "CFPB"), consumer complaints about debt buyers and collectors attempting to collect money not actually owed by the consumer are by far the most common of all complaints received by the Bureau every year, aside from credit reporting. MCM is near the top for the entire country in terms of the volume of such complaints against debt buyers.

22. For instance, in 2015, the CFPB entered into a Consent Order with MCM, and related entities, for violations of the law, including the FDCPA, which required MCM, and related entities, to pay more than $42,000,000 in restitution and $10,000,000 civil penalty for i) failing to investigate disputes made by consumers, ii) forcing consumers to restart the dispute process each time a debt was transferred to a different debt collector, iii) falsely representing to consumers information regarding a debt when it was known or had reason to believe the information to be inaccurate, iv) engaging in scattershot litigation, v) preventing debt collectors from obtaining account-level documentation regarding consumer debts, vi) submitting affidavits to courts around the country with false or misleading testimony, vii) submitting affidavits to court around the country with false or misleading statements by sellers of the debt, viii) threatening and filing lawsuits to collect time-barred debts, ix) training collectors to create urgency when collecting time-barred debt over the telephone, and x) sending settlement offers to collect time-barred debts without

COMPLAINT AND
DEMAND FOR JURY TRIAL

informing the consumer that the debt was time-barred.

23.    In 2018, 42 States Attorneys General entered into a settlement with MCM, and related entities, for $6,000,000 related to deceptive debt collection and litigation practices, such as filing affidavits in courts across the country when the affiant lacked personal knowledge related to the statements in the affidavit and did not review the relevant files, also known as robo-signing.

24.    Then, in 2020, the CFPB filed an action in the U.S. District Court for Southern District of California against MCM, and related entities, asserting MCM, and related entities, failed to comply with the 2015 Consent Order by continuing to engaging in the prohibited conduct in the 2015 Consent Order. *See Bureau of Consumer Financial Protection v. Encore Capital Group, Inc., et al.*, No. 20-cv-1750-GPC-KSC (S.D. Cal. Oct. 16, 2020) (entering stipulation of final judgment.)

25.    Despite the foregoing, Upgrade regularly transfers alleged debts of consumers to MCM for purposes of collection.

26.    Plaintiff maintained two personal accounts with Upgrade.

27.    At some point, Plaintiff fell behind on payments.

28.    Thereafter, Upgrade began furnishing negative information regarding the accounts to the credit reporting agencies.

29.    Upgrade's negative credit reporting of the accounts negatively impacted

COMPLAINT AND
DEMAND FOR JURY TRIAL

Plaintiff's credit score.

30.    Upgrade's negative credit reporting of the accounts negatively impacted Plaintiff's creditworthiness.

31.    Equifax, Experian, and TransUnion (collectively, the "CRAs") are the three major consumer reporting agencies in the United States, and regularly publish and distribute credit information about Plaintiff and other consumers through the sale of consumer reports.

32.    The reports of CRAs generally contain the following information: (i) Header/Identifying Information: this section generally includes the consumer's name, current and prior addresses, date of birth, and phone numbers; (ii) Tradeline Information: this section pertains to consumer credit history, and includes the type of credit account, credit limit or loan amount, account balance, payment history, and status; (iii) Public Record Information: this section typically includes public record information, such as bankruptcy filings; and (iv) Credit Inquiries: this section lists every entity that has accessed the consumer's file through a "hard inquiry" (i.e., consumer-initiated activities, such as applications for credit cards, to rent an apartment, to open a deposit account, or for other services) or "soft inquiry" (i.e., user-initiated inquiries like prescreening).

33.    The CRAs obtain consumer information from various sources. Some

consumer information is sent directly to the credit reporting agencies by furnishers, and other information is independently gathered by credit reporting agencies from third party providers, vendors, or repositories, like computerized reporting services like PACER and Lexis-Nexis.

34.    The majority of institutions that offer financial services (e.g., banks, creditors, lenders) rely upon consumer reports from credit reporting agencies to make lending decisions.

35.    Those institutions also use FICO Scores, and other proprietary third-party algorithms (or "scoring" models), including debt-to-income ratios, to interpret the information in a consumer's consumer report, which is based on the amount of reported debt, payment history, and date of delinquencies contained in the CRAs' consumer reports.

36.    Accounts in collection is the biggest factor use in FICO Scores, and consumers with collections on their credit reports likely have lower credit scores than consumers who have no collections.

37.    The information credit reporting agencies include in a consumer report contributes to a consumer's overall creditworthiness and determines their FICO Scores.

38.    FICO Scores are calculated using information contained in the

consumer's report.

39.    FICO and other third-party algorithms use variables or "attributes" derived from a consumer's consumer report to calculate a "credit score," which is a direct reflection of a consumer's creditworthiness.

40.    FICO Scores factor in the following consumer report information: Payment history (35%); Amount of debt (30%); Length of credit history (15%); New credit (10%); and Credit mix (10%).

41.    "Payment history" refers to whether a consumer has paid his or his bills in the past, and whether these payments have been timely, late, or missed. In factoring the severity of delinquent payments, a FICO Score considers how late the payment continues to be, how much is owed, how recently the delinquency occurred, and how many delinquent accounts exist. The more severe, recent, and frequent late payments are, the lower a consumer's FICO Score will be.

42.    The "amount of debt" a consumer owes has a major impact on their credit score. When a credit reporting agency reports a debt as outstanding when it is in fact discharged, the credit reporting agency indicates that a consumer's "amount of debt" is higher than it actually is, which will undoubtedly impact a consumer's credit score.

43.    Lenders also consider a consumer's debt-to-income ratio before

deciding to extend credit or approve financing terms.

44.    Banks, landlords, credit card issuers, employers, insurance companies, utility providers, among others, all use credit scores to assess how likely a consumer is to make timely payments. A higher credit score leads to better loan terms and lower interest rates, while a lower credit score leads to worse loan terms, higher interest rates, and/or credit denials.

45.    Debt-to-income compares the total amount a consumer owes to the total amount a consumer earns.

46.    A consumer's income, however, is not included in their consumer report; only their amount of debt is.

47.    The higher the amount of reported debt that a consumer has, or appears to have, the worse the consumer's debt-to-income will be, and the more difficult it will be for a consumer to obtain credit and favorable credit terms (e.g., higher interest and lower credit limits).

48.    According to data provided by the Consumer Financial Protection Bureau ("CFPB"), consumer complaints about credit reporting and debt collectors attempting to collect money not actually owed by the consumer are by far the most common of all complaints received by the CFPB every year.

49.    The impact of debt and debt collection is not just financial. In fact, the

Federal Reserve Bank of Atlanta published a study, which was the joint collaboration of economists Laura Argys, Andrew Friedson, and Federal Reserve economist M. Melinda Pitts, that directly linked financial strain from higher debt levels to higher death rates among American consumers.[1] The study also found, the impact of delinquency is most pronounced in the short-term as individuals are far more likely to die as a result of an immediate debt shock than in response to lingering debt.[2] As part of the study, the economists analyzed credit balance and delinquency data maintained by the Federal Reserve.[3] The results, while not surprising, showed that individuals with bad credit and higher amounts of delinquent debt, had a higher probability of death than those with better credit and smaller amounts of delinquent debt.[4]

50.    Then, Upgrade purportedly transferred one of the accounts to Velocity Investments, LLC ("Velocity") and the other to MCM for purposes of collection.

51.    Thereafter, the account transferred to Velocity was extinguished as part of an agreement.

52.    With respect to the account transferred to MCM, in an effort to collect

---

[1] Laura M. Argys, Andrew Friedson, & M. Melinda Pitts, *Killer Debt: The Impact of Debt on Mortality*, FRB Atlanta Working Paper No. 2016-14 (2016).

[2] *Id*. at 14.

[3] *Id*. at 3.

[4] *Id*. at 4.

COMPLAINT AND
DEMAND FOR JURY TRIAL

the alleged debt, MCM caused an email dated February 5, 2025 (the "February Email") to be sent to Plaintiff directly.

53.    Plaintiff received and read the February Email.

54.    The February Email alleged that Plaintiff no longer owed money to Upgrade, but now owed $351.11 to MCM.

55.    However, Plaintiff was never indebted to MCM.

56.    Despite not owing MCM any money, MCM began furnishing negative information regarding the alleged debt to one or more of the credit reporting agencies.

57.    However, Upgrade was already reporting the account on Plaintiff's credit reports.

58.    In fact, Upgrade was reporting an account number of 11277XXXX, but MCM is reporting an account number of 32313XXXX.

59.    In addition, Upgrade was reporting an open date of May 21, 2021, but MCM is reporting an open date of June 28, 2023.

60.    Further, Upgrade was reporting a different balance in the amount of $337.00, but MCM is reporting $351.00.

61.    Moreover, MCM was reporting the original creditor as Telhio Credit Union, not Upgrade.

62.    MCM's credit reporting negatively impacted Plaintiff's credit.

COMPLAINT AND
DEMAND FOR JURY TRIAL

63.    MCM's    credit    reporting    negatively    impacted    Plaintiff's creditworthiness.

64.    MCM's credit reporting negatively impacted Plaintiff's credit score.

65.    MCM's credit reporting was viewed by third parties.

66.    The algorithm of the credit reporting agencies is coded in such a way that negative reporting impacts a consumer's score more than positive reporting.

67.    The algorithm of the credit reporting agencies is coded in such a way that a consumer's credit score does not increase to the same degree as the consumer's credit score decreased when a negative account is deleted.

68.    The duplicate reporting by MCM and Upgrade caused a negative impact on Plaintiff's credit score, causing Plaintiff to be harm a second time for the same account.

69.    The duplicate reporting by MCM and Upgrade caused a negative impact on Plaintiff's creditworthiness, causing Plaintiff to be harm a second time for the same account.

70.    When MCM began reporting the same account as Upgrade, while Upgrade was still reporting the account, Plaintiff's credit score was negatively impacted a second time because the algorithm of the credit reporting agencies understood the MCM reporting to be a new negative report.

COMPLAINT AND
DEMAND FOR JURY TRIAL

71.    MCM and Upgrade know the foregoing, and uses credit reporting as a way to coerce consumers into paying MCM.

72.    MCM and Upgrade know the foregoing, and uses credit reporting as a way to coerce consumers into paying MCM for debts not owed to MCM.

73.    The duplicate reporting by MCM and Upgrade provided the appearance that Plaintiff had two different accounts.

74.    The duplicate reporting by MCM and Upgrade provided any third-party who viewed Plaintiff's credit reports with the reasonable belief that Plaintiff had two different delinquent/defaulted accounts.

75.    Any reasonable reviewer of Plaintiff's credit reports would reasonably believe the MCM reporting was a new negative account.

76.    MCM's duplicate reporting of the Upgrade account is false, misleading, and/or deceptive because of the foregoing.

77.    MCM's duplicate reporting of the Upgrade account is unfair and/or unconscionable because of the foregoing.

78.    MCM's duplicate credit reporting of the Upgrade account is conduct the natural consequence of which is to harass, abuse, and/or oppress because of the foregoing.

79.    MCM and Upgrade engages in these practices to coerce consumers into

COMPLAINT AND
DEMAND FOR JURY TRIAL

paying debts to MCM because consumers are desperately trying to increase their credit scores.

80.    Nevertheless, Plaintiff became aware of MCM's credit reporting.

81.    Thereafter, Plaintiff obtained a copy of her credit reports.

82.    Plaintiff spent time and energy accessing, downloading, and reviewing her credit reports on numerous occasions, including March 28, 2025, and June 13, 2025.

83.    Then, on July 28, 2025, Plaintiff sent a written dispute to Equifax, Experian, and TU regarding MCM and Upgrade's reporting via USPS Certified Mail.

84.    In fact, in the relevant part, Plaintiff's dispute stated:

**MIDLAND CREDIT MANAGEMENT**
**32313XXXX**

I have never had an account with Midland Credit Management. I have never applied for credit with Midland Credit Management. I have never received credit from Midland Credit Management. I have never heard of Midland Credit Management. I do not owe any money to Midland Credit Management. My reports indicate an open date of June 28, 2023, however, I never opened an account with this entity. It is believed this account relates to an Upgrade, Inc. - Telhio Credit Union account. Upgrade is already reporting this account with a different open date and different amount. The duplicate reporting has negatively impacted my credit score and creditworthiness.

**UPGRADE INC**
**12565XXXX**

This account indicates that it was closed. In addition, this account

indicates that it was sold to Velocity Investments, LLC, but is still reporting. This account was the subject of a settlement agreement with Velocity Investments, LLC and the debt was extinguished. Upgrade was or should have been informed of the same by Velocity Investments, LLC. As a result, this reporting must be deleted.

85.     Plaintiff spent time and energy preparing the dispute letters to the CRAs.

86.     Plaintiff spent approximately forty (40) minutes traveling to and from the U.S. Post Office and incurred a cost of $18.24 mailing the dispute letter to the CRAs.

87.     Plaintiff's dispute notified Equifax, Experian, and TransUnion that the information reported by MCM and Upgrade was inaccurate.

88.     Once Equifax, Experian, and TransUnion each received the dispute from Plaintiff, each were required to provide notice of such dispute and request for re-investigation to the furnisher, in this case MCM and Upgrade.

89.     Equifax, Experian, and TransUnion each transmitted notice of the dispute to MCM and Upgrade via an Automated Credit Dispute Verification form ("ACDV").

90.     MCM and Upgrade were required to investigate Plaintiff's dispute in full upon receipt of the ACDVs, and by extension, notice of the inaccuracy.

91.     After receiving this notice, in any subsequent voluntary reporting, MCM and Upgrade must then delete the tradeline or update the tradeline to correct

COMPLAINT AND
DEMAND FOR JURY TRIAL

inaccurate information, as well as include the dispute notation on the account.

92. After receipt of Plaintiff's dispute, MCM and Upgrade re-reported the accounts as accurate to the CRAs.

93. However, if MCM and Upgrade had properly investigated Plaintiff's disputes, MCM and Upgrade would have uncovered that its reporting was inaccurate and/or misleading.

94. Thereafter, Plaintiff obtained a copy of her credit reports.

95. Plaintiff spent time and energy accessing, downloading, and reviewing her credit reports on numerous occasions, including August 18, 2025, and August 25, 2025.

96. Then, on August 21, 2025, Plaintiff sent a written dispute to Experian regarding Upgrade's reporting, and on September 3, 2025, Plaintiff sent a written dispute to TransUnion regarding Upgrade's reporting via USPS Certified Mail.

97. In fact, in the relevant part, Plaintiff's dispute stated:

**UPGRADE INC**
**11277XXXX**

This account indicates that it was closed. In addition, this account indicates that it was sold to Midland Credit Management, but is still reporting. In fact, Midland Credit Management reporting this account with a different open date and different amount. The duplicate reporting has negatively impacted my credit score and creditworthiness.

98. Also, on September 3, 2025, Plaintiff sent another written dispute to

Equifax regarding MCM and Upgrade's reporting via USPS Certified Mail.

99.    In fact, in the relevant part, Plaintiff's dispute to Equifax stated:

**MIDLAND CREDIT MANAGEMENT**
**32313XXXX**

I have never had an account with Midland Credit Management. I have never applied for credit with Midland Credit Management. I have never received credit from Midland Credit Management. I have never heard of Midland Credit Management. I do not owe any money to Midland Credit Management. My reports indicate an open date of June 28, 2023, however, I never opened an account with this entity. It is believed this account relates to an Upgrade, Inc. - Telhio Credit Union account. Upgrade is already reporting this account with a different open date and different amount. The duplicate reporting has negatively impacted my credit score and creditworthiness.

**UPGRADE INC**
**11277XXXX**

This account indicates that it was closed. In addition, this account indicates that it was sold to Midland Credit Management, but is still reporting. In fact, Midland Credit Management reporting this account with a different open date and different amount. The duplicate reporting has negatively impacted my credit score and creditworthiness.

**UPGRADE INC**
**12565XXXX**

This account indicates that it was closed. In addition, this account indicates that it was sold to Velocity Investments, LLC, but is still reporting. This account was the subject of a settlement agreement with Velocity Investments, LLC and the debt was extinguished. Upgrade was or should have been informed of the same by Velocity Investments, LLC. As a result, this reporting must be deleted.

100.    Plaintiff spent time and energy preparing the additional dispute letter to

Equifax.

101.   Plaintiff spent approximately forty-five (45) minutes traveling to and from the U.S. Post Office and incurred a cost of $18.24 mailing the additional dispute letters.

102.   Plaintiff's dispute notified Experian and TransUnion that the information reported by Upgrade was inaccurate.

103.   Plaintiff's dispute notified Equifax that the information reported by MCM and Upgrade was inaccurate.

104.   Once Experian, TransUnion, and Equifax received the disputes from Plaintiff, each was required to provide notice of such dispute and request for re-investigation to the furnisher, in this case MCM and Upgrade.

105.   Experian and TransUnion transmitted notice of the dispute to Upgrade via an Automated Credit Dispute Verification form ("ACDV").

106.   Equifax transmitted notice of the dispute to MCM and Upgrade via an Automated Credit Dispute Verification form ("ACDV").

107.   MCM and Upgrade were required to investigate Plaintiff's dispute in full upon receipt of the ACDVs, and by extension, notice of the inaccuracy.

108.   After receiving this notice, in any subsequent voluntary reporting, MCM and Upgrade must then delete the tradeline or update the tradeline to correct

inaccurate information, as well as include the dispute notation.

109.   After receipt of Plaintiff's dispute, MCM and Upgrade re-reported the accounts as accurate.

110.   However, if MCM and Upgrade had properly investigated Plaintiff's disputes, MCM and Upgrade would have uncovered that its reporting was inaccurate and/or misleading.

111.   Thereafter, Plaintiff obtained a copy of her credit reports.

112.   Plaintiff spent time and energy accessing, downloading, and reviewing her credit reports on numerous occasions, including September 22, 2025.

113.   Plaintiff spent time and energy reviewing response letters from the CRAs.

114.   Plaintiff suffered injury-in-fact by being subjected to inaccurate, unfair, and abusive practices of MCM and Upgrade.

115.   Plaintiff suffered actual harm by being the target of inaccurate and/or misleading credit reporting by MCM and Upgrade.

116.   Plaintiff suffered actual harm because Plaintiff spent time learning about her rights to dispute inaccurate and/or misleading information being reported on her credit reports.

117.   Plaintiff suffered actual harm because Plaintiff spent hours reviewing

her records regarding the alleged debt.

118.   Plaintiff suffered actual harm because Plaintiff spent hours accessing, downloading, and reviewing her credit reports.

119.   Plaintiff suffered actual harm because Plaintiff wasted her time and energy worrying about MCM and Upgrade's conduct.

120.   Plaintiff suffered actual harm because Plaintiff has spent time and energy dealing with MCM and Upgrade's unlawful practices and disputing MCM and Upgrade's credit reporting.

121.   Plaintiff suffered actual harm because Plaintiff has incurred costs associated with disputing MCM and Upgrade's credit reporting.

122.   As a result of MCM and Upgrade's reporting, Plaintiff has lost access to credit.

123.   In fact, Plaintiff became so embarrassed by MCM and Upgrade's reporting that Plaintiff was deterred from applying for credit.

124.   Plaintiff has suffered actual harm based on her costs and time of repairing her credit, pain and suffering, embarrassment, inconvenience, lost economic opportunity, loss of incidental time, frustration, emotional distress, mental anguish, fear of personal and financial safety and security, and attorney's fees.

125.   Plaintiff's injury-in-fact is traceable to the actions or inactions of MCM

and Upgrade.

126.    Plaintiff's injury-in-fact is likely to be redressed by a favorable decision in this Court.

127.    As a result of MCM and Upgrade's conduct, Plaintiff suffered anxiety, stress, and feared that Plaintiff would lose access to credit and/or need to pay higher interest rates.

128.    Plaintiff will continue to suffer harm even if the inaccurate and/or misleading credit reporting is deleted because the algorithm of the CRAs does not provide increases in a consumer's credit score to the same degree as the CRAs decrease a consumer's credit score.

129.    Plaintiff will continue to suffer harm as a result of the inaccurate and/or misleading reporting because, today, a credit score can determine a consumer's ability to secure housing, purchase a car, obtain employment, access essential financial services, among other things.

130.    Plaintiff will continue to spend time and energy monitoring and reviewing her credit reports as a result of MCM and Upgrade's conduct.

131.    The acts of Upgrade as described in this Complaint were performed by Upgrade or on Upgrade's behalf by their owners, officers, agents, and/or employees acting within the scope of their actual or apparent authority.  As such, all references

COMPLAINT AND
DEMAND FOR JURY TRIAL

to Upgrade in this Complaint shall mean Upgrade or their owners, officers, agents, and/or employees.

132.   Upgrade's conduct as described in this Complaint was willful, with the purpose to either harm Plaintiff or with reckless disregard for the harm to Plaintiff that could result from Upgrade's conduct.

133.   But for Upgrade's actions, Plaintiff would not have had to spend time discussing this matter with her attorneys.

134.   But for Upgrade's actions, Plaintiff would not have had to spend time reviewing her credit reports.

135.   But for Upgrade's actions, Plaintiff would not have become aggravated, frustrated, worried, fearful, and distressed.

136.   Plaintiff's anger and frustration continue to this day.

137.   Plaintiff justifiably fears that, absent this Court's intervention, Upgrade will ultimately cause Plaintiff further unwarranted economic harm.

138.   Plaintiff justifiably fears that, absent this Court's intervention, Upgrade will ultimately cause Plaintiff further unwarranted harm to Plaintiff's credit rating.

139.   Upgrade emails caused Plaintiff wasted time, lost time, loss of enjoyment of life and the potential incurrence of fees.

140.   Upgrade infringed upon Plaintiff's right to seclusion.

COMPLAINT AND
DEMAND FOR JURY TRIAL

141.   Upgrade infringed upon Plaintiff's right to quiet enjoyment of life.

142.   Upgrade's conduct as described herein caused Plaintiff to suffer emotional distress, fear, confusion, anxiety, aggravation, annoyance, loss of time, loss of enjoyment of life, and the incurrence of attorneys' fees.

143.   Plaintiff justifiably fears that, absent this Court's intervention, Upgrade will continue to use abusive, deceptive, unfair, and unlawful means in their attempts to collect the alleged debt and other alleged debts.

144.   A favorable decision herein would serve to deter Upgrade from further similar conduct.

### FIRST COUNT
### VIOLATION OF 15 U.S.C. § 1681s-2(b)

145.   Plaintiff repeats and realleges the foregoing paragraphs as if fully restated herein.

146.   Upgrade violated 15 U.S.C. § 1681s-2(b) by continuing to report inaccurate information within Plaintiff's credit file regarding the Upgrade Account with Equifax, Experian, and TransUnion; by failing to fully and properly investigate the Plaintiff's disputes; by failing to review all relevant information regarding Plaintiff's disputes; by failing to accurately respond to Plaintiff's disputes; by failing to correctly report results of an accurate investigation to every credit reporting agency after receipt of Plaintiff's disputes; and by failing to permanently and lawfully correct

its own internal records to prevent the re-reporting of its representations to the consumer reporting agencies.

147.   As a result of this conduct, action, and inaction of Upgrade, Plaintiff suffered damage by loss of credit; a credit denial, loss of the ability to purchase and benefit from credit; having to pay higher insurance premiums and interest rates, and the mental and emotional pain, anguish, humiliation, and embarrassment of a credit denial.

148.   Upgrade's conduct, actions and/or inactions was willful, rendering it liable for actual or statutory, as well as punitive damages, in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, it was negligent entitling the Plaintiff to recover actual damages under 15 U.S.C. § 1681o.

149.   Plaintiff is entitled to recover costs and attorney's fees from Upgrade in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or § 1681o.

## SECOND COUNT
## NEGLIGENCE

150.   Plaintiff repeats and realleges the foregoing paragraphs as if fully restated herein.

151.   Creditors owe consumers a duty of reasonable care in the collection of debts.

152.   Upgrade owed a duty to Plaintiff to exercise reasonable care in its attempts to collect money from Plaintiff.

153.   Upgrade owed a duty to Plaintiff to exercise reasonable care in the transfer of Plaintiff's account to MCM.

154.   Upgrade owed a duty to Plaintiff not to transfer Plaintiff's account to a debt collector that engages in misleading, deceptive, unfair, unconscionable, harassing, abusive, and/or oppressive acts and practices when attempting to collect debts, and engages in deceptive acts and practices when furnishing information to the CRAs.

155.   Upgrade breached these duties by transferring Plaintiff's account to MCM without any regard for the deceptive acts and practices that MCM engages in, and without any regard for the inaccurate and/or misleading information that MCM furnishes to the CRAs.

156.   As a direct and proximate result of Upgrade's negligence, Plaintiff suffered compensable harm and is entitled to recover actual, treble, exemplary, and punitive damages.

1

2

3

4

## THIRD COUNT
### Substantially Assisting Violations of the FDCPA and FCRA: Transfer of a Debt to a Debt Collector That Engages in Misleading, Deceptive, Unfair, Unconscionable, Harassing, Abusive, and/or Oppressive Acts and Furnished Inaccurate and/or Misleading Information

5

6

7

157.   Plaintiff repeats and realleges the foregoing paragraphs as if fully restated herein.

8

9

158.   Upgrade transfers pools of consumer debts to MCM for purposes of collection.

10

11

12

159.   Upgrade participates in the placing and transfer of consumer debt portfolios and has the authority to control the transfers.

13

14

15

16

160.   Upgrade exercises control over MCM regarding the accounts Upgrade transfers to MCM by requiring reporting to Upgrade, auditing MCM, setting policies and procedures, and having the ability to recall accounts.

17

18

19

20

21

161.   Upgrade knows or should know that MCM engages in misleading, deceptive, unfair, unconscionable, harassing, abusive, and/or oppressive acts and practices by violating the law and furnishing inaccurate and/or misleading information to the CRAs.

22

23

24

25

26

162.   The duplicate reporting by Upgrade and MCM has caused a negative impact on Plaintiff's credit score, and caused Plaintiff to be harmed twice for the same account.

27

28

COMPLAINT AND
DEMAND FOR JURY TRIAL

163. The duplicate reporting by Upgrade and MCM provided the appearance that Plaintiff had two different accounts.

164. The duplicate reporting by Upgrade and MCM provided any third-party who viewed Plaintiff's credit reports with the reasonable belief that Plaintiff had two different delinquent/defaulted accounts.

165. The duplicate reporting by Upgrade and MCM is inaccurate and/or misleading.

166. Upgrade and MCM engage in these practices to harass, oppress, or abuse consumers.

167. MCM violated the FDCPA by reporting the Upgrade account to one or more credit reporting agencies when Plaintiff did not owe MCM the money MCM was attempting to collect.

168. MCM violated the FDCPA by reporting the Upgrade account to one or more credit reporting agencies when Upgrade was also reporting the same debt, making MCM's reporting duplicative.

169. MCM violated the FDCPA by reporting the Upgrade account to one or more credit reporting agencies with a different balance than what Upgrade was reporting.

170. MCM violated the FDCPA by reporting the Upgrade account to one or

COMPLAINT AND
DEMAND FOR JURY TRIAL

more credit reporting agencies with a different creditor than what Upgrade was reporting.

171.   MCM violated the FDCPA by reporting the Upgrade account to one or more credit reporting agencies with a different account number than what Upgrade was reporting.

172.   MCM violated the FDCPA by reporting the Upgrade account to one or more credit reporting agencies with a different open date than what Upgrade was reporting.

173.   MCM violated 15 U.S.C. §§ 1692d, 1692e, 1692e(2)(A), 1692e(8), 1692e(10), and 1692f.

174.   MCM violated the FCRA by continuing to report inaccurate information within Plaintiff's credit file regarding the Upgrade Account with Equifax, Experian, and TransUnion; by failing to fully and properly investigate the Plaintiff's disputes; by failing to review all relevant information regarding Plaintiff's disputes; by failing to accurately respond to Plaintiff's disputes; by failing to correctly report results of an accurate investigation to every credit reporting agency after receipt of Plaintiff's disputes; and by failing to permanently and lawfully correct its own internal records to prevent the re-reporting of its representations to the consumer reporting agencies.

175.   Upgrade knows the foregoing and aids in MCM's conduct by failing to

COMPLAINT AND
DEMAND FOR JURY TRIAL

- 30 -

prohibit MCM from engaging in the foregoing conduct.

176. Upgrade and MCM engage in these practices to coerce consumers into paying debts because consumers are desperately trying to increase their credit scores.

177. Upgrade knowingly or recklessly assisted MCM in MCM's misleading, deceptive, unfair, unconscionable, harassing, abusive, and/or oppressive acts and practices.

178. As a direct and proximate result of Upgrade's conduct, Plaintiff suffered compensable harm and is entitled to recover actual, treble, exemplary, and punitive damages.

## JURY DEMAND

179. Plaintiff hereby demands a trial of this action by jury.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests judgment be entered as follows:

    a. Finding Upgrade's actions violate the FCRA; and

    b. Awarding damages to Plaintiff pursuant to 15 U.S.C. § 1681n and/or 1681o for violations of the FCRA against Upgrade; and

    c. Awarding Plaintiff's attorneys' fees pursuant to 15 U.S.C. § 1681n(a)(3) and/or 1681o(a)(2) against Upgrade, calculated on a "lodestar" basis; and

    d. Punitive damages pursuant to 15 U.S.C. § 1681n(a)(2) against Upgrade; and

    e. Awarding the costs of this action to Plaintiff, pursuant to the FDCPA and FCRA; and

1
2
   f. Actual, treble, exemplary, and punitive damages on Plaintiff's negligence causes of action against Upgrade; and

3
4
   g. Actual, treble, exemplary, and punitive damages on Plaintiff's Substantially Assisting Violations of the FDCPA and FCRA causes of action against Upgrade; and

5
6
   h. Awarding pre-judgment interest and post-judgment interest to Plaintiff; all together with

7
   i. Such other and further relief that the Court determines is just and proper.

8

9
DATED: December 4, 2025

10
           Respectfully submitted,

11
           */s/: Ely Grinvald, Esq.*

12
           Ely Grinvald, Esq. (SBN 285475)
           2355 Westwood Blvd., #562

13
           Los Angeles, CA 90064

14
           Phone: (310) 405-5684
           grinvaldely@gmail.com

15
16
           *Attorney for Plaintiff*
           *Melanie Sartor*

17
18
19
20
21
22
23
24
25
26
27
28

COMPLAINT AND
DEMAND FOR JURY TRIAL

- 32 -